UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
FRANCES C. ESPOSITO,                                                       CV 16-4833
                                                                           (ADS)(ARL)
                              Plaintiff,

                     -against-

SUFFOLK COUNTY COMMUNITY COLLEGE, NANCY
GERLI, DIANE BOSCO, and JEFFREY TEMPERA,

                              Defendants.
-------------------------------------------------------------------------X


---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS**

---


                                        Respectfully submitted,

                                        DENNIS M. BROWN
                                        Suffolk County Attorney
                                        *Attorney for Defendants*
                                        H. Lee Dennison Building
                                        100 Veterans Memorial Highway
                                        P.O. Box 6100
                                        Hauppauge, New York 11788-0099

                                   By:  John R. Petrowski
                                        Assistant County Attorney


Dated: Hauppauge, New York
       May 25, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

1.   Plaintiff Fabricated Notes Regarding Her Alleged Disability
     From Dr. Michael Campo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

2.   Plaintiff Fabricated Notes Regarding Her Alleged Disability
     from Dr. Gary DiCanio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

3.   Plaintiff's Willful Misrepresentations in Her Complaint and Perjury at
     Her Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

     A.   Plaintiff Falsely Testified That Her Injuries Were Sustained During a
          Riot at Work That Occurred When She Was Actually Out on Workers'
          Compensation Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.   Plaintiff Falsely Testified About Her Involvement With
          Siah Coffey's Criminal Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.   Plaintiff Falsely Alleges and Testifies That She Suffered a
          Miscarriage and Was Required To Submit Notes From
          Mental Health Providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

I.    PLAINTIFF HAS PERPETRATED A FRAUD UPON THE COURT . . . . . . . . . . 17

II.   THIS COURT HAS THE INHERENT POWER TO DISMISS
      THIS LAWSUIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

III.  DISMISSAL IS WARRANTED BECAUSE PLAINTIFF ENGAGED
      IN LITIGATION MISCONDUCT AND SPOLIATED EVIDENCE . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

## **TABLE OF AUTHORITIES**

### **Cases**

*Abner Realty Inc. v. Administrator of General Servs. Administration,*
  1998 WL 410958 (S.D.N.Y. July 22, 1998) ........................................................... 23

*Amfosakyi v. Frito Lay, Inc.,*
  496 F. App'x 218 (3d Cir. 2012)........................................................................... 19

*Aoude v. Mobil Oil Corp.,*
  892 F.2d 1115 (1st Cir. 1989) .....................................................................17-18, 21

*Ceglia v. Zuckerberg,*
  2013 WL 1208558 (WDNY 2013).......................................................................... 20

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991) ........................................................................................19, 23

*Gleason v. Jandrucko,*
  860 F.2d 556 (2d Cir.1988)................................................................................... 18

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.,*
  322 U.S. 238 (1944) ...................................................................................18, 19, 21

*McMunn v. Memorial Sloan–Kettering Cancer Ctr,*
  191 F.Supp.2d 440 (SDNY 2002) ............................................... 17, 18, 20, 21, 22

*Residential Funding Corp. v. DeGeorge Financial Corp.,*
  306 F.3d 99 (2d Cir. 2002)..................................................................................... 23

*Shangold v. Walt Disney Co.,*
  275 Fed. App'x 72 (2d Cir. 2008) .................................................................19, 20, 22

*Shangold v. Walt Disney Co.,*
  2006 WL 71672 (S.D.N.Y. Jan. 12, 2006) ............................................................ 19

*Skywark v. Isaacson,*
  1999 WL 1489038 (SDNY 1999) ................................................................17, 20, 21

*Valentine v. Museum of Modern Art,*
  29 F.3d 47 (1994) .................................................................................................. 21

*West v. Goodyear Tire & Rubber Co.,*
  167 F.3d 776 (2d Cir. 1999)...........................................................................20, 22-23

## **Statutes**

42 U.S.C. § 1983 ........................................................................................................... 1

Americans With Disabilities Act ........................................................................... 1, 18

Rehabilitation Act of 1973 ......................................................................................... 1

New York State Human Rights Law ........................................................................... 1

## **Rules**

F.R.C.P. Rule 11 ..................................................................................................... 1, 23

F.R.C.P. Rule 12(c) ..................................................................................................... 1

F.R.C.P. Rule 37 ..................................................................................................... 1, 23

## <u>PRELIMINARY STATEMENT</u>

This Memorandum of Law is respectfully submitted on behalf of Defendants Suffolk County Community College ("SCCC" or the "College"), Nancy Gerli, Diane Bosco and Jeffrey Tempera (collectively, the "Defendants") in support of Defendants' motion for sanctions, including striking the Complaint and for other appropriate relief, pursuant to Rule 11, Rule 12(c) and Rule 37 of the Federal Rules of Civil Procedure, on the grounds that Plaintiff has perpetrated a fraud on the Court that warrants the immediate dismissal of this action and the imposition of other appropriate sanctions, including costs and attorney fees.

Plaintiff Frances Esposito has been employed by the College since 2003 in the part-time position of Adjunct Instructor first and then Adjunct Assistant Professor in the Reading Department at Ammerman Campus.  Her 447-paragraph Complaint (**Exh. A,** Complaint [Exhibit references are to the Exhibits annexed to the Declaration of John R. Petrowski dated May 25, 2018]) alleges several counts of discrimination on the basis of her alleged disability and the denial of purported requests for reasonable accommodation, as well as retaliation for bringing complaints relating thereto, pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 and the New York State Human Rights Law.

Plaintiff essentially alleges that she and her doctors advised the College in 2005, 2006 and 2009 of her purported disability and her need to be scheduled for back-to-back classes in the same classroom, among other things.  She alleges failure to promote, failure to provide reasonable accommodation and retaliation for bringing internal complaints in December 2009 and her 2010 complaint to the Equal Employment Opportunity Commission ("EEOC"), which found probable cause and referred the matter to the U.S. Department of Justice ("DOJ").  The DOJ declined to prosecute and the EEOC issued a right to sue under the ADA in 2016 (DE 1).

1

Plaintiff's lawsuit is a fraud.  Defendants will establish by clear and convincing evidence that this lawsuit is based on Plaintiff's perpetration of a fraud upon the Court, the EEOC and the DOJ.  Although Plaintiff's fraud has been suspected by Defendants for some time, it has now been confirmed by admissible documentary evidence and sworn deposition testimony, including that of the doctors who Plaintiff identified as having authored medical opinions and documents regarding her purported disability and need for reasonable accommodation.

Discovery in this matter closed on March 30, 2018 and has recently been reopened over the Defendants' objection to permit additional discovery until June 29, 2018.  (See 5/1/18 Order on DE 30).  The parties have exchanged approximately 14,000 pages of documents and all parties have been deposed, as well as two of Plaintiff's medical providers, two Deans from the College, and several third party witnesses.  At this point in the case, Defendants have deemed it appropriate to seek summary dismissal and other sanctions, including costs and attorney fees, and respectfully submit that to allow the case to go forward would allow Plaintiff to further perpetrate fraud upon this Court, will undermine the integrity of the proceeding and the judicial process, and will compel the Court and the Defendants to continue to waste valuable resources.

Plaintiff has presented forged and fabricated documents in this federal action and to the EEOC, including numerous doctors' notes that were not contained in her certified medical records and that have been disavowed by their purported authors at their depositions.  Plaintiff also repeatedly perjured herself during her 7-hour video-recorded deposition and has an established pattern of lying.

For the reasons set forth herein, the Defendants should be awarded sanctions, including striking the Complaint, costs and fees, together with any such other or further relief that the Court deems just and proper.

## STATEMENT OF FACTS

Plaintiff's claims are based on false statements as well as fraudulent, fabricated and forged documents, including all of the doctors' notes she purports to have submitted to the College before 2010 requesting certain accommodations. These notes form the basis of her claims that she made requests for reasonable accommodations which were ignored or rejected by Defendants, when in fact they are fabricated and forged notes that were not submitted to the College until after she filed her EEOC complaint in 2010.

**1.   Plaintiff Fabricated Notes Regarding Her Alleged Disability From Dr. Michael Campo**

Plaintiff alleges in her Complaint that she first notified the College of her purported disability and requested certain accommodations, including back-to-back classes in the same classroom, in a note from Dr. Michael Campo dated August 8, 2005, which states that she was "unable to walk from building to building" and that "same room accommodation is necessary." (See **Exh. A,** Complaint, at ¶¶ 53-58; **Exh. C,** 8/8/05 Letter). The record evidence clearly establishes that this letter is fabricated and forged and was not actually received by the College until after Plaintiff filed her charge of discrimination with the EEOC in 2010.

Significantly, the letterhead used by Plaintiff when forging the letter has an address for Dr. Campo's office of "700 Horseblock Road," an address which Dr. Campo did not use until 2010. Moreover, the note was not contained in his medical records, and he disavowed it at his deposition. (**Exh. G**, Campo Tr. at pp. 7-13, 24-28). In that regard, Dr. Campo testified as follows:

> Q:  In 2005, did you ever use the address 700 Horseblock Road for any reason?
> A:  I don't believe so. Let me get my timeline right.  In 2005, no, it wouldn't have been there.
> Q:  Prior to 2010, did your practice ever use the address of 700 Horseblock Road on any of its documents?
> A:  No.

Q:  When was the first time your practice used the address of 700 Horseblock Road on any of its documents?

A:  Again, on or about 2010.

Q:  Did you change your company letterhead in 2010 to reflect the new address of 700 Horseblock Road?

A:  Once I was in the new facility, the address changed in the heading.

(**Exh. G**, Campo Tr. at pp. 11-12).

\*       \*       \*       \*       \*

Q:  I'm going to show you a document that was previously marked as Defendant's Exhibit A and just ask you to take a look at the document.

A:  (Complying.)

Q:  And can you tell me if that document appears in the file that you brought with you today?

A:  That does not appear in my file.  Let me just double check though, pardon me.

Q:  Sure.

A:  This is 2005.  That does not make sense.

Q:  Now, in looking at Defendant's Exhibit A, does your signature appear on that document?

A:  Well, it's -- I don't think that's my signature.

Q:  In looking at Defendant's Exhibit A, do you see the letterhead on the top of the document?

A:  Correct.  This was an old address that I had in Mastic, but, you know, I wasn't in my building until 2010-ish so...

Q:  What's the address on Defendant's Exhibit A?  I'm sorry, what's the date on this?

A:  August 8, 2005.

Q:  What is the Farmingville address that's listed on the document?

A:  It's 700 Horseblock Road.

Q:  Can you tell me why the 700 Horseblock Road address is on this document when you didn't move there until 2010?

A:  I couldn't tell you.

Q:  Could this letter have been written on August 8, 2005?

A:  It couldn't have been.

Q:  Why not?

A:  Because I wasn't at 700 Horseblock.  That wouldn't have been my -- I can't take responsibility for that letter.

Q:  Is there anything else about this letter that looks unusual to you?

4

A:  Well, the heading, it looks like it's cut off.  I don't know if it's a copy issue as far as the spacing from the top.  You know, it's not my formatted disability letter, which would look like this (indicating).

(**Exh. G**, Campo Tr. at pp. 24-26).

In another fabricated note from Dr. Campo dated "8-9-05," Plaintiff obviously altered an authentic note from him dated "11-19-04" by whiting-out and adding, among other things, that she is "unable to walk from building to building" and "same room accommodation necessary." (Compare altered 8/9/05 note at **Exh. E** with authentic 11/19/04 note at **Exh. D**).  The authentic November 19, 2004 note states that Plaintiff "is totally disabled and unable to work for the next 6 weeks."  (**Exh. D**).

The fabricated note of August 9, 2005 is addressed to "Human Resources SCCC" and Defendant Nancy Gerli, the Academic Chair of the Reading Department at the SCCC Ammerman Campus, stating that Plaintiff "is partially disabled and unable to walk from building to building.  Same room accommodation necessary.  Teach in technology equipped room.  No lifting or stair climbing or prolonged standing."  Plaintiff has clearly fabricated this letter by whiting-out the statement contained in the November 19, 2004 letter set forth above and rewriting the aforementioned statement of her purported limitations and need for accommodations.

Dr. Campo testified that shortly before his deposition, Plaintiff had dropped off papers with his office which Plaintiff requested to be included with her medical records.  (**Exh. G**, Campo Tr. at p. 36).  He had not seen the papers and was not sure whether they were included in the file he brought with him to his deposition.  In response to a request that he produce the documents that Plaintiff brought to his office, Dr. Campo contacted the County Attorney's office on March 29, 2018 and advised that unbeknownst to him, the papers provided by Plaintiff had in fact been included in the file he brought with him to his deposition.  He was therefore unable to

testify at his deposition about the falsity of the "8-9-05" note and the fact that it was not in his records.

In a letter from Dr. Campo to the County Attorney dated March 29, 2018, which was sent along with Dr. Campo's signed and notarized deposition transcript and which had a post-it attached to it with the words "Errata Sheet," Dr. Campo confirms the Plaintiff's forgery and states, among other things, that "In review of my disability notes, it appears that the 8/9/05 disability note that I do not possess was forged using the disability note dated 11/19/04." (**Exh. F**, 3/29/18 letter from Dr. Campo). Dr. Campo further states in his March 29, 2018 letter that his office manager compiled his records for his deposition and "included the 'disability notes' that Ms. Esposito dropped off" at his office just prior to his deposition.

The record evidence clearly establishes that not only has Plaintiff altered, forged and fabricated notes from Dr. Campo, but she also interfered with his testimony and the medical records he brought with him to his deposition. Significantly, the notes from Dr. Campo form the basis of her claims that she made requests for reasonable accommodations that went ignored or rejected by Defendants, when in fact they are fabricated and forged notes that were not submitted to the College until after she filed her EEOC complaint in 2010.

## 2. **Plaintiff Fabricated Notes Regarding Her Alleged Disability From Dr. Gary DiCanio**

Plaintiff also produced several fabricated notes from Dr. Gary DiCanio. One note dated "September 2006" states "request reasonable room accommodation teaching consecutive classes no traveling between classes/buildings." (**Exh. H**, Sept. 2006 note). This note, however, was not contained in Dr. DiCanio's certified medical records. Moreover, it was inexplicably addressed to Defendant Diane Bosco, even though Professor Bosco was only a faculty member in 2006 and did not assume a supervisory role as the Assistant Chair of the Reading Department until 2011.

In another note produced by Plaintiff purported to be from Dr. DiCanio dated "9/2009," the fabricated letterhead contains the incorrect fax number "631-508-0485," which transposed the correct prefix of "580." (**Exh. I**, 9/2009 note). This note also was not contained in Dr. DiCanio's certified records, and he testified that his letterhead never had the wrong fax number. (**Exh. L**, DiCanio Tr. at pp. 20-21, 31-33).

Plaintiff also produced a form purported to be from Dr. DiCanio entitled "Physician's Documentation of Disability" dated "12/30/14," which contains numerous comments and writings not written by Dr. DiCanio. (**Exh. J**, 12/30/14 form with comments). This document was not contained in Dr. DiCanio's certified medical records.

In a letter from Plaintiff's counsel to Lou Petrizzo, General Counsel of SCCC, dated August 10, 2015, Plaintiff purports to re-submit the 12/30/14 form described in the preceding paragraph, but the form under cover of the August 10, 2015 letter is written in completely different handwriting, does not contain the marginal notes from the form at **EXHIBIT J** and clearly has a different signature. (Compare 12/30/14 form at **Exh. J** with 12/30/14 form at **Exh. K**). The form at **EXHIBIT K** was contained in Dr. DiCanio's certified medical records except for the signature page. Dr. DiCanio testified at his deposition that the signature on the form at **EXHIBIT K** is not his signature. (**Exh. L**, DiCanio Tr. at pp. 43-45).

Like the fabricated notes from Dr. Campo, the fabricated notes from Dr. DiCanio form the basis of Plaintiff's claims that she made requests for reasonable accommodations that Defendants ignored or rejected, when in fact they are fabricated and forged notes that were not submitted to the College until after she filed her EEOC complaint in 2010.

**3.  Plaintiff's Willful Misrepresentations in Her Complaint and Perjury at Her Deposition**

    **A.  Plaintiff Falsely Testified That Her Injuries Were Sustained During a Riot at Work That Occurred When She Was Actually Out on Workers' Compensation Leave**

The clear and convincing evidence adduced during discovery establishes that the College had not been notified of Plaintiff's purported disability and need for accommodation until her first internal complaint in or about December 2009, and that she was provided with the requested accommodations from the Spring 2010 semester to the present.  The record further establishes that Plaintiff does not suffer from a "disability" as that term is defined under the ADA.

Plaintiff has repeatedly perjured herself as to the extent of her disability, among many other things.  In a glaring example, she claims in ¶ 51 of her Complaint that "On or about December 6, 2004, Plaintiff was the victim of a brutal assault during a riot at Wyandanch High School…"  (**Exh. A,** Complaint at ¶ 51).  The injuries purportedly sustained while working at that school form the basis of her claim of disability and need for reasonable accommodation.

The overwhelming record evidence, however, clearly establishes that she was injured (if at all) during a fistfight between two students on November 4, 2004, and was actually out on worker's compensation leave at the time of the publicized riot on December 6, 2004.  (*See, e.g.*, Trick Healy, *13 Arrested After Brawl at High School in Suffolk*, N.Y. TIMES (Dec. 7, 2004). (**Exh. P**, 12/7/04 N.Y. Times Article).

Plaintiff falsely testified at her deposition that she was injured on November 4, 2004 when she was "brutally assaulted during a gang riot."  (**Exh. B,** Esposito Tr. at pp. 59-75).  She continued with lie after lie for over 30 minutes of sworn testimony stating that hundreds of students were rioting and assaulting her and that "all" the police responded to the school.  The record evidence, including the accident report Plaintiff submitted to her employer contemporaneously with the alleged injury, completely negates her fictionalized version of events.  (See **Exh. O**, Employee Accident Report to Wyandanch High School).

In the accident report submitted contemporaneously with the incident on November 4, 2004 and signed by the Plaintiff on that date, Plaintiff wrote that "Two male students were fighting in the cafeteria and all other students rushed to see." (*Id.*). The nurse's statement on the form indicates "Ice pack applied to [Plaintiff's] forehead. Right edema evident. Rest at home for remaining of day. Follow up w/ MD if edema persists." (*Id.*). Principal Spruill further indicated on the form that Plaintiff "told me she was okay and would return to work the next day." (*Id.*).

The following deposition testimony clearly establishes Plaintiff's perjury regarding the extent of her alleged injuries and how they were purportedly sustained:

Q: When did you stop working at Wyandanch?

A: November 4, 2004.

Q: November 4, two thousand --

A: Four.

Q: What were the circumstances of your leaving employment at Wyandanch?

A: I was, um, brutally assaulted during a gang riot.

Q: How many people were involved in that riot?

A: Well, there -- I was in the cafeteria and I was doing lunch duty. There was a gas leak at the middle school so in addition to our students – we were full capacity -- they brought over between 200 and 250 students from the middle school and they put them all in the cafeteria. So, if you ask me how many students were in there, 250 more than there should have been, um, and then there was – there was, you know, a lot going on at that school. There was -- you know, the gangs were recognized and so there was an outbreak between gangs and I was assaulted.

Q: Do you know the name of the gangs?

A: I don't want to say, sir, because it frightens me to, um -- I'm afraid of them still. Um, I can say it, you know. I -- I just don't want them to become aware of me recognizing any of the gangs because, you know, I want to protect my family and myself and they are very able to, um -- to come back for revenge, but if you want me to say, I'll say it.

*        *        *        *        *

Q: When the riot occurred, how many students were actually engaged in violence?

A: Every student, sir. Every student began to physically fight and assault each other. It was a riot.

Q: And you estimate approximately 250 students?

9

A:  No.  It was 200 -- between 200 and 250 were brought over from the middle school.  We already had over -- well over 100 students in the cafeteria already so...

Q: So, there were over 300 students involved in --

A: Oh, yeah.

Q:  -- in the violence?

A:  Definitely.  And when we would have, um, the riot, it wouldn't -- it wouldn't be just like one or two kids fighting.  It -- it would become like hysteria and every single student would get involved and so it just becomes -- it's -- it's unbelievable.  It isn't anything that you – you wouldn't even imagine.  I wish I would have known what I was getting into going to teach there.  It was -- it was bad because -

Q: Where did -- I'm sorry to interrupt you.  Where did the violence occur?

A:  Where the kids eat in the cafeteria and then they have this brick wall with windows in between and then in -- then there's an adjoining hallway where they're allowed to, um -- - after they're done eating, they're allowed to go there and talk to each other so it happened in that entire area, but what happened when word gets that there's, like, a riot, um, I'm not kidding, kids come out of their classrooms in the whole entire school.  We would have the police come daily.  Even on the first day of school, the police came twice.  The 1st Precinct, you become very familiar with the officers.

Q:  Did the police respond to this riot --

A:  Yes.

Q: -- on November 4, 2004?  How many -- can you estimate how many patrol cars or units responded?

A:  I don't know.  I think all -- whoever the -- I mean, like every -- they came -- they pretty much come daily.  Like I said, there's always some, like -- you know, they would find a gun in the bathroom so they call the police and somebody would come and retrieve the gun, you know, or -- you know, it's just -- the police officers were there all the time, I mean, like I said.

Q: On this particular date of the riot, how many police came?

A: I'm really -- I would say most of the police department, I think.

*     *     *     *     *

Q:  What was the nature of your immediate injuries at the riot on November 4, 2004?

A:  Can you say that again?

Q: Can you please describe the nature of your injuries from the riot on November 4, 2004?

A:  Sure. Um, well, I sustained head injuries.  I had bruises to my skull, I had bruises pretty much everywhere.  I was, um -- my head was taken and slammed into the cylinder -- the wall was made of, like, cylinder concrete and my head was slammed.  I was kicked.  Um, I have a hip injury, I had contusions to my skull, I had back injuries, I had bruises all up and down.

10

Q:  How did you sustain the injuries to your back and hip?

A:  From them assaulting me.

Q:  Can you please describe how you were assaulted that would come to your injuries?

A:  So, I -- after they would punch me and throw me into the wall -- a lot of students, not just one or two -- I fell down into this, like, little crevice against the brick -- the wall and I fell down.  I was just holding my hands up to protect myself and they would kick me and punch me and they would make comments that were -- basically, they -- they had the intentions to kill me because they were like, We're going to fucken kill you, you white bitch.  There was a lot of reverse discrimination there so just based on the color of my skin, they assumed I was 100 percent Caucasian so they -- they had -- like I said, there was a lot of reverse discrimination.  They just would be – they would assault any teacher even if they weren't -- whatever.

Q:  Okay. Let's just stick with how you sustained your injuries.  You said that multiple students had --

A:  Through the beating.  Yeah, many, many.

Q: -- punched you?

A:  Punched me, kicked me, slammed me against the wall, yeah.  And then just being pushed against the wall, being kicked and just -- it was pretty brutal.

\*       \*       \*       \*       \*

Q:  And were there more than 10 students that were assaulting you, would you say?

A:  You know when you're like this (indicating), you really can't count.

Q:  More than two?

A:  Oh, definitely.

Q:  More than five?

A:  Yeah.  They would take turns coming up and kick me.

(**Exh. B,** Esposito Tr. at pp. 59-68).

Plaintiff clearly perjured herself and testified that she was "brutally assaulted during a gang riot," rather that testifying truthfully that she was pushed during a fistfight between two students, to bolster her claims that she is disabled and in need of certain accommodations.

### B.  **Plaintiff Falsely Testified About Her Involvement With Siah Coffey's Criminal Defense**

Plaintiff also perjured herself in connection with allegations involving a former student of hers, Siah Coffey.  In her Complaint, Plaintiff alleges that Defendant Diane Bosco, the Assistant

Chair of the Reading Department, approached Mr. Coffey on three separate occasions and offered him a passing grade in Ms. Esposito's class if he were to report that Ms. Esposito made racially offensive remarks during class so she could be fired.  (**Exh. A,** Complaint at ¶ 191; see also **Exh. B,** Esposito Tr. at pp. 233-35).

Professor Bosco emphatically denies this outrageous and defamatory lie.  The record evidence establishes that Plaintiff offered to use her contacts in the music industry to advance Mr. Coffey's rap music career, provided him with gifts and other things of value, and assisted him with his defense in a criminal action against him involving felony gun charges.  Plaintiff's false allegations, fraud and perjury have prejudiced Defendants by significantly impeding their ability to develop their theory that she assisted Mr. Coffey in his criminal defense in exchange for his false testimony against Professor Bosco.  At her deposition, Plaintiff was asked if she ever spoke to Mr. Coffey's attorney or went to court on his behalf, and she falsely testified as follows:

Q:  Are you aware that Mr. Coffey had been charged with criminal offenses?

A:  Yes.

Q:  What was he charged with?

A:  I don't know.  He never really told me.  He just said he got in trouble and I -- I asked and he never really clarified.  I still don't know until today.  I do know that it has -- it has been resolved.  He did receive probation.

Q:  When did that happen?

A:  Couple of months ago.  Maybe a month ago.  When did it happen?  I don't know.  When he told me?  Like a month ago.  It's been resolved and he's going back to school.

Q:  Good for him.

A:  Good for him.  I'm very pleased with that.  He learned his lesson.

Q:  I'm sorry.  So you did see him since the summer, correct?  You saw him --

A:  No.  I saw him in the summer.  I haven't seen him since then.

Q:  Did he tell you over the phone about him receiving probation?

A:  E-mail.

Q:  How often do you e-mail each other?

A:  Just around the holidays. . . .

12

Q:  Have you ever -- did you ever speak to his defense attorney in the criminal action?

A  Yes.

Q:  Who is that?

A:  I don't know if his first name was Ryan or his last name was Ryan.

Q:  What were the circumstances under which you spoke to his defense lawyer?

A:  I told him that Siah was a part of my class and ugly circumstances led to him being out of the school and, um, just what character he is, that he came forward for me when he didn't have to and just a witness to that, I believe, he's a good person and he just made a big mistake.

Q:  Did you appear in court on his behalf?

A:  It never -- it was settled so there was -- as far as I know.

Q:  Did you ever appear in court on behalf of Mr. Coffey?

A:  No.

Q:  In his criminal action?

A:  No.  I never went into the courtroom.

Q:  Never saw the judge?

A:  No, no, no, no, no, no.

Q:  Did you ever speak to the district attorney that was responsible for prosecuting Mr. Coffey?

A:  That was the guy, Mr. Ryan.

Q:  That was Mr. Ryan.  And -- okay. So, Mr. Ryan was the assistant district attorney prosecuting Mr. Coffey?

A:  Yes, yes.

Q:  I'm sorry if I wasn't clear.  Did you speak with Mr. Coffey's attorney?

A:  No.

Q:  Do you know who Mr. Coffey's attorney was?

A:  No.

Q:  Did you ever recommend an attorney to Mr. Coffey in the criminal action?

A:  No, I don't believe so, no.  He got his -- his mother worked for an attorney.

Q:  Was that the attorney that represented him in the criminal action --

A:  Yes.

(**Exh. B,** Esposito Tr. at pp. 244-48).

The record evidence, including e-mails exchanged between Plaintiff and Mr. Coffey and Mr. Coffey's sworn deposition testimony, clearly establish that Plaintiff lied under oath about the extent of her involvement in Mr. Coffey's criminal defense.  (See **Exh. Q**, Coffey emails; and

13

**Exh. M**, Coffey Tr. at pp. 31-38, 46-56).  In an email dated June 21, 2016, Plaintiff wrote the

following to Mr. Coffey:

> Siah,
>
> Remember I asked your attorney what the deal was & he pulled you aside
> avoiding responding to me.  Well the moron didn't know what the deal was bc the
> idiot never called back the Prosecutor to get the deal.  He spoke to them yesterday
> after I left.  He is useless & worthless.  My attorney said he would have gotten it
> down to a 4th degree misdemeanor.  Your attorney wants to fight with me not
> work with me bc I exposed what a lazy shit he is.
>
> I am upset that you will have to be a convicted felon bc your lawyer SUCKS!  I
> will stay home next time if you want.  I said that is your choice.  If you want I can
> throw a Hail Mary pass & ask for the lesser charge.  Your judge is new to the
> bench & tough on gun charges.  Your crap lawyer said he won't let me talk to the
> judge. Umm too late I already wrote him a letter.  I need the pic of you & the
> Governor & you & Russell Simmons.
>
> If you say don't do anything I won't but remember that when you are sitting in
> prison for many more years.  You should have hired the attorney I sent you to.
> He is much more experienced & Free.  What happened yesterday was outrageous.
> My attorney was in shocked that he told me to leave.  Austin has a reputation for
> being what you said an AHole.  He won't care when you go away bc he wants to
> say it was your teacher's fault when in fact it's bc he is a big loser.  He aggravates
> the wrong people.  You will pay the price for it.
>
> If you say step back I will.  It's all up to you.  I care about your future & want to
> help.  It's all your decision.
> (**Exh. Q,** Coffey emails).

Siah Coffey's deposition testimony also directly contradicts Plaintiff's testimony

regarding her involvement in his criminal defense:

> Q:  Did Professor Esposito help you in any way in defending you against the
> charges?
> A:  Help me? I don't know if it really helped.  I mean, maybe, possibly, because I
> asked a lot of people to write letters for me, but Fran, she went out the way to
> actually try and speak to the ADA.  I just asked for letters, because the ADA, he
> pretty much said I was a drug dealer, I'm a gang member, and that's just not me,
> you know.  Like, maybe when I was younger I was into stuff like that, but like I
> said, I steered my life a different direction, so, like, for him to bring up stuff from
> 2006 and all that, I just didn't want him, you know, I was trying at the time, like,
> they're telling me I'm doing three and a half years, so anything I can do to try and
> change his mind, and that's where I was heading.
> Q:  Do you remember his name?

A:  Ryan Hunter.

Q:  Yeah, Hunter.  And who was your attorney in those criminal proceedings?

A:  Austin Manghan.

Q:  So Professor Esposito spoke to the DA Ryan Hunter?

A:  I don't know if they actually spoke.  I think she tried to contact him and he called my lawyer, like, who is this lady.  So pretty much, I don't know if it helped, if it made it worse, because he was still trying to give me three and a half years, so I don't know. . . .

Q:  How about Austin, did Professor Esposito speak with Austin?

A:  Yeah.  Austin is an asshole.  So that conversation didn't go too well.  I just had to separate them, like --

Q:  Were you there?

A:  Yeah, I was there.

Q:  And there was a confrontation?

A:  Yeah. I won't say, like, confrontation.  Like, Austin is just, like, who are you?  Like why are you here?  And she was, like, oh, I'm his old professor, and he's just, like, trying to belittle her.  He was just, like, and I just had to separate them.  It was so bad. . . .

*       *       *       *       *

Q:  Well, please tell me a little bit more about that.  I'd like to know when that was, first of all, when did Professor Esposito appear in court?

A:  I don't remember the date.

Q:  The month maybe?

A:  I couldn't tell you. I think it was my first actual date, or second date, so sometime in 2016, I want to say.

Q:  And it was in court?

A:  Yeah.

Q:  The judge, do you remember the judge's name?

A:  Mazzei.

Q:  Timothy Mazzei?

A:  Yeah.

Q:  And where is his courthouse?

A:  In Riverhead.

Q:  In Riverhead.  So Professor Esposito went to Riverhead on your behalf --

A:  Yup.

Q:  -- and addressed your lawyer, and they got into some kind of an argument?

A:  Yeah.

(**Exh. M**, Coffey Tr. at pp. 32-35; see also pp. 47-50).

It is clear that Plaintiff falsely testified under oath by lying about the extent of her involvement in Siah Coffey's criminal defense in an effort to undermine the Defendants' ability to develop the theory that she manipulated Mr. Coffey and aided in his criminal defense in exchange for his false testimony against Defendant Diane Bosco.

### C. Plaintiff Falsely Alleges and Testifies That She Suffered a Miscarriage and Was Required To Submit Notes From Mental Health Providers

In her Complaint, Plaintiff falsely claims that she suffered a miscarriage "in or around October 2006" and that as a result, Defendant Nancy Gerli, Academic Chair of the Reading Department, perceived her to have been mentally ill and required her to submit notes from mental health providers to prove she was fit for duty at the College.  (**Exh. A,** Complaint at ¶¶ 66-77; see also **Exh. B,** Esposito Tr. at pp. 160, 177-183).

Professor Gerli has emphatically denied such outrageous and defamatory claims. Plaintiff's false allegations, fraud and perjury have prejudiced Defendants by significantly impeding their ability to develop their theory that the notes from mental health providers that were produced by Plaintiff during discovery were actually obtained by Plaintiff for the purpose of refuting allegations by her ex-husband, John Ringold, that she was mentally ill, in the context of their contested divorce proceedings, and were not in any way ever requested by Nancy Gerli. (See **Exh. B,** Esposito Tr. at pp. 177-183).

Mr. Ringold, who was dating and later married Plaintiff during the time she allegedly miscarried, testified at his deposition that he was unaware that Plaintiff ever became pregnant or ever had a miscarriage:

Q:  At some point after you started dating Frances Esposito, did she become pregnant?
A: No.
Q: Did she ever tell you that she suffered a miscarriage?
A: She, I believe so, but then I believe she also stated that it was a false -- I don't really remember.  I'm sorry.

16

Q:  Did you ever attend any doctor's appointments with her for a miscarriage?

A:  I don't believe so.

Q:  Did you ever attend any doctor's appointment with her for being pregnant?

A:  I don't remember.

\*        \*        \*        \*        \*

Q:  So Exhibit C, Defendant's Exhibit C, the first letter is dated May 23, 2007 from Hospice Care Network.  The first paragraph, second sentence, "Fran had a miscarriage on October 29, 2006 and has sought our support to address her grief." Is it your understanding that Fran did not have a miscarriage?

A:  Yeah, I don't remember that at all.

(**Exh. N,** Ringold Tr. at pp. 14-15, 26-26).

Plaintiff falsely testified under oath about her alleged miscarriage and about Nancy Gerli requiring her to submit notes from mental health providers to keep her job.  Plaintiff's fraud and perjury have significantly impeded the Defendants' ability to assess her claims and to develop a defense to her allegations.   Furthermore, Plaintiff has refused to provide (i) a HIPAA authorization for her health care provider in connection with her alleged miscarriage and (ii) access to the certified records from her divorce proceeding to determine whether the notes from the mental health providers were actually submitted in connection therewith.

## DISCUSSION

I.      **PLAINTIFF HAS PERPETRATED A FRAUD UPON THE COURT**

Fraud upon the court "occurs where a party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." *McMunn v. Memorial Sloan–Kettering Cancer Ctr*, 191 F.Supp.2d 440, 445 (SDNY 2002), quoting *Skywark v. Isaacson,* 1999 WL 1489038, at \*14 (SDNY 1999).  In other words, a fraud upon the court

> occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

17

*Id.*, quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir. 1989).

Fraud upon the court is "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988). It strikes a discordant chord and threatens the integrity of the legal system as a whole, constituting "a wrong against the institutions set up to protect and safeguard the public" *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246 (1944).

In *McMunn v. Memorial Sloan–Kettering Cancer Ctr.*, *supra*, the Southern District Court found that plaintiff perpetrated a fraud on the court, dismissed her complaint with prejudice and awarded the defendant the sum of $20,000 with interest accruing from the date of the order. *McMunn.* 191 F.Supp.2d at 460-62. Like the Plaintiff in this action, the plaintiff in *McMunn* commenced suit against her employer alleging disability discrimination in violation of the ADA. Following discovery, defendant moved to dismiss citing "improper conduct of the plaintiff" (*Id.* at 443). The court found plaintiff "lied at her deposition ... intentionally and in bad faith, and that her false testimony directly and irrevocably destroyed potentially critical evidence" (*Id*. at 448); plaintiff "repeatedly lied and misled [defendant] in an intentional effort to prevent it from deposing [a material witness]" (*Id.* at 452); and plaintiff "intentionally spoiled relevant evidence" (*Id*. at 454).

The conduct of the Plaintiff in the instant action is far more egregious than the plaintiff in *McMunn*. Defendants have set forth by clear and convincing evidence that Plaintiff has submitted fabricated, altered and forged notes from medical providers to substantiate her false claims of disability and requests for accommodation. She interfered with witnesses and dropped off fabricated, altered and forged medical records with Dr. Campo's office to be included in her file prior to his deposition. She has made repeated willful and outrageous misrepresentations about the circumstances that led to her alleged injury and nature and extent of her purported

18

disability, and has falsely testified under oath about her disability and requesting accommodations from the College prior to 2010. She has defamed individual defendant Diane Bosco by falsely accusing her of approaching Siah Coffey in effort to have Plaintiff fired. She has falsely testified under oath as to the extent of her involvement in Mr. Coffey's criminal defense. She has defamed individual defendant Nancy Gerli by falsely accusing her of demanding notes from mental health providers after Plaintiff allegedly suffered a miscarriage. Most significantly, she has committed a "fraud which seriously affects the integrity of the normal process of adjudication" and has effectively deprived the Defendants of their ability to assess her claims and to develop certain defenses and legal theories. Plaintiff has therefore perpetrated a fraud on the Court and must be sanctioned accordingly.

## II.     THIS COURT HAS THE INHERENT POWER TO DISMISS THIS LAWSUIT

The Supreme Court and the Second Circuit have repeatedly held that federal district courts have the inherent power to dismiss lawsuits where a plaintiff has submitted forged documents or is otherwise perpetrating a fraud on the court. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) ("outright dismissal of a lawsuit" under the court's inherent authority "is within the court's discretion"); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 250 (1944) (district court is warranted in dismissing a case once it learns of the fraud); *Shangold v. Walt Disney Co.*, 275 Fed. App'x 72, 73 (2d Cir. 2008) (affirming dismissal for fraud on the court because "the defendants have established, by clear and convincing evidence, that [the plaintiffs] submitted fraudulent evidence to the district court in order to bolster their claim").

This inherent power may be invoked before a case proceeds to summary judgment or trial. *See, e.g.*, *Shangold*, 2006 WL 71672, at *6 (S.D.N.Y. Jan. 12, 2006), *aff'd*, 275 F. App'x at 73–74; *see also Amfosakyi v. Frito Lay, Inc.*, 496 F. App'x 218, 225 (3d Cir. 2012) (upholding dismissal where record established plaintiff falsified a document produced in discovery that was

material to his claim of discrimination and then testified falsely in his deposition regarding that document).

Moreover, "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits. This is the essence of a fraud upon the court." *McMunn.* 191 F.Supp.2d at 445. Fraud on the court therefore warrants heavy sanctions, including the striking of an offending party's pleadings and dismissal of the action. *Id.* at 462 (court dismissed plaintiff's claim finding "a lesser penalty ... would be ineffective as a sanction for [plaintiff's] dishonest behavior, which pervades every aspect of this case"); see also *Shangold v. Walt Disney Co.*, 275 Fed. App'x 72 (affirming dismissal for fraud on the court); *Skywark v. Isaacson,* 1999 WL 1489038, at *18 (granting defendants' motion to dismiss for fraud on the court); *Ceglia v. Zuckerberg*, 2013 WL 1208558 (WDNY 2013) (granting defendants' motion to dismiss based on fraud on the court and spoliation of evidence).

In *Shangold v. Walt Disney Co., supra,* plaintiffs were authors who had submitted story proposals to a publisher owned by defendant, and sued defendant claiming that defendant published a book similar to plaintiff's 1995 story. Defendant established that the plaintiffs' 1995 submission contained several references to a "Palm Pilot," a device which was not in existence when plaintiffs allegedly submitted their story proposal. 275 Fed. App'x at 73-74. Accordingly, the court found plaintiffs intentionally fabricated the basis for their lawsuit, and bolstered that fabrication with perjury. (*Id.*). In dismissing plaintiffs' action, the court noted "no sanction short of dismissal [would] suffice to deter future misconduct" (2006 WL 71672, *5, 2006 U.S. Dist. LEXIS 748, *15). In affirming on appeal, the Second Circuit further stated "While dismissal is a harsh sanction it 'is appropriate if there is a showing of willfulness, bad faith, or fault on the part

20

of the sanctioned party.'"  275 Fed. App'x at 74, quoting *West v. Goodyear Tire & Rubber Co.*,

167 F.3d 776, 779 (2d Cir. 1999).

In its award of sanctions against the plaintiff in *McMunn*, *supra,* the Southern District

Court provided the following analysis in its holding:

> We acknowledge that dismissal is a harsh sanction to be used only in extreme situations.  *E.g., Valentine v. Museum of Modern Art,* 29 F.3d 47, 49 (1994). When faced with a fraud upon the court, however, such a powerful sanction is entirely appropriate.  *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir. 1989) ("we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process—to combat those who would dare to practice unmitigated fraud upon the court itself"); *see also, e.g., Skywark,* 1999 WL 1489038, at *1 (granting motion dismissing case for fraud upon the court); *cf. Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (vacating a judgment twelve years after it became final for fraud upon the court).
>
> There can be no doubt that Ms. McMunn has abused the judicial system from which she sought relief, and consideration of all the factors enumerated above reinforce this conclusion.  First, we find that she acted intentionally and in bad faith.  Second, her actions prejudiced Memorial by seriously impeding its ability to obtain relevant discovery as well as by forcing it to expend a tremendous amount of money and time both in trying to defend the merits of Ms. McMunn's employment discrimination claims as well as in proving *462 that she engaged in unfair litigation practices.   Third, it is obvious that Ms. McMunn's actions constitute a pattern of misbehavior rather than an isolated instance.  Fourth, Ms. McMunn has not even attempted to correct the vast majority of her deceptive conduct.  Fifth, and perhaps most importantly, it is clear that Ms. McMunn's lies and misconduct will almost certainly continue in the future if this action is permitted to go forward, thus nullifying any chance for a fair adjudication of the merits of her claim.  She has shown no remorse for her deceptions, offered no apologies for her lies, and never corrected her misstatements.  In short, she deserves to be punished severely for perpetrating a fraud upon this Court.
>
> Indeed, she deserves the harsh sanction of dismissal with prejudice.  In reaching the conclusion that dismissal is the proper remedy, we considered the feasibility and effectiveness of lesser sanctions.  We found, however, that a lesser penalty, such as a jury instruction, would be ineffective as a sanction for Ms. McMunn's dishonest behavior, which pervades every aspect of this case.  Ms. McMunn has lied and convinced others (Mr. Keeping and Cameron McMunn) to lie.  She has altered, destroyed, and otherwise spoiled evidence.  She has concealed the whereabouts of a material witness.   There can be no doubt that she has irrevocably tainted these proceedings.

Furthermore, we considered whether a large monetary sanction alone would be an adequate sanction.  We concluded that such an award would be a hollow victory for Memorial, as it would likely be uncollectible.  Ms. McMunn has already exhibited manipulative financial behavior and has not hesitated to lie with respect to her misconduct.  Thus, a monetary sanction that represents the additional costs, fees, and expenses incurred by Memorial due to Ms. McMunn's misbehavior, therefore, would not sufficiently punish her, nor would it remove the taint from this case.  Nevertheless, in light of the magnitude of the additional costs and expenses she imposed on Memorial through her misconduct, we feel that she should pay for at least part of the costs she caused Memorial to incur.  Accordingly, we award a monetary sanction against Ms. McMunn in the amount of $20,000, to be paid to Memorial.

CONCLUSION

For the foregoing reasons, we hereby dismiss Ms. McMunn's complaint against Memorial with prejudice.  Furthermore, we order Ms. McMunn to pay Memorial $20,000 with interest accruing from the date of this Memorandum and Order.

*McMunn*, 191 F.Supp.2d at 461-462 (footnotes omitted).

In addition to striking the Complaint and dismissing this action, monetary sanctions should be awarded to Defendants because of the substantial and unnecessary expenditures incurred throughout this litigation as a result of Plaintiff's fraud since 2010 when Plaintiff filed her EEOC complaint.   The County Attorney's office has calculated that between the five Assistant County Attorneys involved in this case since 2010, approximately 1500 attorney hours were spent on its defense.  Applying a loadstar rate of $250/hour, the County Attorney estimates the costs associated with defending against Plaintiff's fraudulent lawsuit to be $375,000 plus costs.  See *Shangold v. Walt Disney Co.,* 275 Fed. App'x at 74-75 (affirming district court's award of $10,000 in addition to the dismissal of the action); *McMunn,* 191 F.Supp.2d at 461-62 (awarding defendant $20,000 plus interest in addition to the dismissal of the action).

## III.   DISMISSAL IS WARRANTED BECAUSE PLAINTIFF ENGAGED IN LITIGATION MISCONDUCT AND SPOLIATED EVIDENCE

In addition to dismissing for fraud, district courts have the power to dismiss lawsuits when a party has committed severe misconduct in the course of litigation, including spoliation of

evidence.   Spoliation encompasses not just destruction of evidence but also "significant alteration of evidence."  *See, e.g.*, *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  A court may rely upon Rule 37(b) when spoliation occurs in violation of a court order or pursuant to the Court's inherent power to control litigation as the basis for dismissal. *Chambers*, 501 U.S. *v. NASCO, Inc.*, 501 U.S. 32, 45 (1991); *West v. Goodyear Tire & Rubber Co.*, 167 at 779.

Defendants have established all three elements supporting sanctions for spoliation of evidence, including:  (1) Plaintiff had control over the evidence and had an obligation to preserve it at the time it was destroyed or altered; (2) the records were altered or destroyed with a culpable state of mind; and (3) that the destroyed/altered evidence was relevant to Defendants' defense, such that a reasonable trier of fact could find that it would support the defense.  *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).  As set forth in the factual analysis above, the documents produced by Plaintiff reveal that she fabricated, altered and forged documents material to her claims that she is disabled, that she requested accommodations for an alleged disability, and that her requests were denied or ignored. Plaintiff's misconduct in the course of this litigation warrants the imposition of appropriate sanctions, including summary dismissal and an award of costs and fees to the Defendants.

Plaintiff's fraud and litigation misconduct would have been evident upon reasonable investigation by counsel as required by Rule 11.  By presenting to the Court a pleading, an attorney "certifies that, to the best of the person's knowledge, information, and belief, *formed after inquiry reasonable under the circumstances*…the factual contentions have evidentiary support…."  F.R.C.P. Rule 11(b)(3) (emphasis added).   In conducting such an inquiry, it is not sufficient for an attorney simply to rely on the word of a client when additional sources are available.  *Abner Realty Inc. v. Administrator of General Servs. Administration*, No. 97 Civ.

23

3075, 1998 WL 410958, at *4 (S.D.N.Y. July 22, 1998) ("[W]here an attorney can get the information necessary to certify the validity of a claim in a public fashion and need not rely solely on his client, he must do so.").

## **CONCLUSION**

Based upon the foregoing, the Defendants respectfully request that this Court grant its motion for sanctions, including striking the Complaint and awarding Defendants costs and attorney fees, together with such further and other relief as the Court deems just and proper.

Dated: Hauppauge, New York
      May 25, 2018

                                     Respectfully submitted,

                                     Dennis M. Brown
                                     Suffolk County Attorney

By:    *John R. Petrowski*
                                     John R. Petrowski
                                     Assistant County Attorney
                                     100 Veterans Highway
                                     Hauppauge, NY  11788
                                     (631) 853-4660