UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
FRANCES C. ESPOSITO,

                      Plaintiff,              **MEMORANDUM OF DECISION & ORDER**

            -against-                    16-cv-04833(GRB)(ARL)

SUFFOLK COUNTY COMMUNITY
COLLEGE, NANCY GERLI, DIANE BOSCO,
and JEFFREY TEMPERA,

                      Defendants.
----------------------------------------------------------X

**APPEARANCES:**

**Ellenoff Grossman & Schole LLP**
*Pro Bono Attorneys for the Plaintiff*
1345 Avenue of the Americas, 11th Floor
New York, NY 10105
    By:    Amanda M. Fugazy, Robert James
             Anderson

**Harfenist Kraut & Perlstein LLP**
*Pro Bono Attorneys for the Plaintiff*
3000 Marcus Ave., 2nd Floor East
Lake Success, NY 11042
    By:    Andrew C. Lang, Steven J. Harfenist

**Suffolk County Attorney's Office**
*Attorneys for Defendants*
100 Vets Memorial Hwy
Hauppauge, NY 11788
    By:    John Richard Petrowski, Assistant
             County Attorney, Dana Kobos,
             Assistant County Attorney, Elaine M.
             Barraga, Assistant County Attorney

**GARY R. BROWN, United States District Judge**:

       Federal litigation constitutes a search for truth. The thorough, refined processes administered by this Court are designed to provide parties with fair, efficient and highly effective methods to discover and develop evidence and resolve disputes. From time to time,

however, a party will attempt to tamper with or fabricate evidence. The result can be a costly detour that threatens to undermine the protections built into the system and fundamentally impede the process. This case, sadly, provides a painful and flagrant example.

In this action, Frances Esposito ("plaintiff"), an adjunct college professor sporting advanced educational degrees, altered, forged and tampered with evidence, and repeatedly perjured herself to conceal these misdeeds. The late Honorable Arthur D. Spatt, to whom this matter was previously assigned, a judge whose commitment to fairness and law is rarely equaled, labored mightily to correct the balance, declining to dismiss the case and instead imposing a panoply of remedies upon plaintiff in an effort to allow her claims to proceed notwithstanding her egregious conduct. Unfortunately, though, now that the Court is confronted with a fuller record in connection with various motions by the parties, it appears in light of this record that the remedies previously imposed fall short. Some are simply unworkable as, for example, the plaintiff lacks the financial wherewithal to pay the awarded attorneys' fees, which would help defray the significant costs unfairly imposed on the defendants and provide a deterrent to such conduct. More importantly, careful examination of the materials submitted reveals that the plaintiff's contumacious conduct – which remains uncorrected by her – has infected the evidentiary record and continues to impair the search for truth. As such, dismissal of plaintiff's claims, it turns out, represents the only fair resolution of this case.

*Procedural History and Relevant Facts*

This heavily-litigated matter bears an extensive record. Plaintiff commenced this proceeding more than four years ago through the filing of a 55-page complaint containing nearly 450 paragraphs of allegations and fourteen causes of action. Familiarity with the

following court orders are assumed: (1) Judge Spatt's order of March 4, 2019 referring the case to Magistrate Judge Arlene Lindsay for an evidentiary hearing following the defendants' motion to dismiss and for other sanctions, Docket Entry ("DE") 52; (2) the evidentiary hearing held in May 2019, DE 62, 63, 66; (3) the findings of Magistrate Lindsay, set forth in a transcript of proceedings held in July 2019, DE 69; (4) Judge Spatt's order of July 26, 2019, adopting the findings by Judge Lindsay and imposing sanctions, DE 71, *Esposito v. Suffolk Cty. Cmty. Coll.*, 390 F. Supp. 3d 428, 431 (E.D.N.Y. 2019); and (5) Judge Spatt's order of October 31, 2019, appointing *pro bono* counsel for plaintiff, DE 87.[1]

A brief review of the matter is warranted. As Judge Spatt noted, in her weighty complaint, plaintiff

> alleges that she and her doctors advised the College in 2005, 2006 and 2009 of her purported disability and her need to be scheduled for back-to-back classes in the same classroom, among other requests. She alleges failure to promote, failure to provide reasonable accommodation and retaliation for bringing internal complaints in December 2009 and a 2010 complaint to the Equal Employment Opportunity Commission ("EEOC").

DE 52 at 2. Esposito brings these claims against Suffolk County Community College ("SCCC") at which she is employed, the Academic Chair and Assistant Academic Chair of SCCC's Reading and College Seminar Department and its Assistant Vice President for Employee Relations (collectively, "defendants"). After an extensive discovery process, defendants moved for sanctions – including but not limited to dismissal – based on conduct which, defendants asserted, amounted to a fraud on the Court. *Id.*

Specifically, defendants contended that there was evidence that plaintiff forged treatment notes by her treating physicians, Drs. Campo and DiCanio. Those records were critical to certain

---

[1] For avoidance of doubt, the misdeeds described in this decision are in no way attributable to *pro bono* counsel, who labored admirably – if, at times, a bit aggressively – to represent the plaintiff, having inherited a terribly difficult record.

3

of plaintiff's claims because, in sum and substance, the records from Drs. Campo and DiCanio helped define her claimed disability, and, because she alleged that she contemporaneously provided these records to the defendant college, they represented the basis for her claims of discrimination and failure to accommodate. These documents, identifying her purported need for accommodations, are ubiquitous among plaintiffs allegations: Defendants' counsel has contended, without contradiction, that "the plaintiff references the purported need for her accommodation and the failure to give those accommodations 110 times in her federal complaint, and she references it in 11 of the 14 causes of action that she brought against the college." DE 63 at 5-6.

After a searching review of the written submissions, Judge Spatt found that "the Court is confident that it possesses sufficient evidence to find that the Plaintiff forged Dr. Campo's notes." DE 52 at 7. As to Dr. DiCanio's notes, Judge Spatt found that, based solely on the written submissions, "the record does not sufficiently establish by clear and convincing evidence that she forged these notes." *Id.* at 9. Out of abundance of caution, though, Judge Spatt referred the matter to Magistrate Judge Lindsay "for an evidentiary hearing regarding the authenticity of Dr. Campo's August 8, 2005 and August 9, 2005 letters and Dr. DiCanio's September 2006 letter, September 2009 note and December 30, 2014 forms." *Id*. at 16.

Over a series of days, Magistrate Judge Lindsay held a hearing, which included testimony from plaintiff, the subject physicians, office staff and several college officials. DE 62, 63, 66. Following the hearing, Magistrate Judge Lindsay made findings on the record, in which she determined that defendants established by clear and convincing evidence that plaintiff had forged Dr. Campo's records. Specifically, one of Dr. Campo's medical notes, identified as J-3, was an unauthorized, altered version of an earlier legitimate document prepared by the doctor. DE 69 at

4

3-5. Judge Lindsay noted that the document "was central to the claim of disability discrimination and the failure to accommodate," as it included a list of accommodations required by the plaintiff. *Id.* at 3-4. She found plaintiff's explanation for this alteration "simply not believable." *Id.* at 5-7. A second document, J-2, dated in 2005, was actually created in 2010. *Id.* at 8. Therefore, Judge Lindsay concluded:

> I find by clear and convincing evidence that with respect to J-2 and J-3, those documents were created by plaintiff or at plaintiff's behest. They were not authentic documents of Dr. Campo's office. And she submitted J-2 and J-3 or caused J-2 and J-3 to be submitted knowing that they were not true chiropractic notes of Dr. Campo.

*Id.* at 14. Review of these forged, altered records reveals that plaintiff used these documents to manufacture a list of required accommodations purportedly imposed by Dr. Campo which, in truth and fact, he did not find necessary for plaintiff (and, based on the testimony of the doctor, would not have found necessary). DE 66 at 35-36, 72; DE 69 at 3-4, 8. Moreover, the alterations included fraudulent, manufactured "proof" that Dr. Campo's medical documentation supporting accommodations had been provided to SCCC, when, in fact, this was untrue. DE 66 at 27-28; DE 69 at 4.

As to Dr. DiCanio's records, Magistrate Judge Lindsay decided – as was her charge – that defendants failed to establish that his records constituted a *forgery*. DE 69 at 14-15. *De novo* review of the transcript and documents confirms that the magistrate judge was correct in her determination. That same review, however, sheds light on another question that was not referred to the magistrate judge: whether the records and related evidence are unreliable and/or the product of other improper behavior by the plaintiff. Tellingly, the answer to that question is overwhelmingly affirmative. As has been conceded, the subject records of Dr. DiCanio were not part of the certified medical record produced by his office, there were multiple versions (signed

5

and unsigned) of at least one of these records, these varying versions had substantive differences, portions of the records were not written by the doctor, and there is indication that the Bates numbers may have been altered in connection with the submission of these records. *See, e.g.*, DE 63 at 86, 93-100; DE 69 at 14. The doctor testified that it was "possible" that plaintiff created some of the subject notes which he then signed, including those pertaining to the reasonable accommodations allegedly requested from SCCC. DE 63 at 69, 85-86. Plaintiff admits that her handwriting appears on DiCanio's records, describing an unorthodox "collaboration" between her and the doctor that is inconsistent with typical methods of producing medical records. *Id.* at 181. DiCanio described himself as being "friends" with the plaintiff and, contrary to his usual practice, provided her with his personal cell phone number. *Id.* at 27-29. While DiCanio denied that the plaintiff had ever threatened him, the record includes text messages from the plaintiff to Dr. DiCanio – sent via that personal cell phone – threatening him with malpractice and disciplinary action, *including one message sent on the eve of his deposition in this case. Id.* at 56-66. In one such message, the plaintiff advised DiCanio that "My evidence will destroy your career." *Id.* All of this evidence led Magistrate Judge Lindsay to conclude that "every one of those doctor's notes or treatment notes were written by the plaintiff." DE 69 at 14. At the same time, Judge Lindsay found that:

> But Dr. Dicanio said notwithstanding the fact that not one of these documents was written by him and not one of these documents was maintained in his patient file, he testified under oath that he signed off on them. The practice that he described was he would simply ask the plaintiff what she wanted included and he just let her write it out. And so those treatment notes even though he testified that she was the only patient he allowed to do this, it's clear that these treatment notes were authorized by him.

*Id.* at 14-15. Thus, while not forgeries *per se*, evidence demonstrates that these records were produced under circumstances that render them questionable, if not entirely unreliable, as the

6

Magistrate Judge suggested. *Id.* at 15 ("there may be some question as to the reliability of these notes").

But the *de novo* review of the record also reveals evidence about additional actions by the plaintiff that are highly problematic. The documentary evidence reveals that the plaintiff submitted purported records from the doctors – several of which were pure forgeries – to the EEOC to obtain the right to sue letter, a required antecedent to this case. DE 63 at 129-30, 155. In 2016, the defendant reviewed the complaint filed in this case and verified its accuracy, even though it expressly relies on the forged records from Dr. Campo. *Id*. at 132-34. Notwithstanding the incontrovertible falsity of the allegations relating to Dr. Campo's note, plaintiff continued – in sworn testimony at the evidentiary hearing before Judge Lindsay – to maintain that such allegations were true. *Id.* at 134. She falsely testified that she had received Dr. Campo's August 9, 2005 report – which the evidence establishes she created years later – on that date from his office. *Id.* at 149. In an attempt to explain away the numerous physical and chronological inconsistencies in the documentary evidence, plaintiff spun tangled and unconvincing tales which, unsurprisingly, Magistrate Judge Lindsay rejected. *See generally id.* Such conduct by plaintiff, who maintained her fabricated claims even under direct questioning by the Court, simply cannot be condoned. *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) ("False testimony in a formal proceeding is intolerable. We must neither reward nor condone such a 'flagrant affront' to the truth-seeking function of adversary proceedings. . . . Perjury should be severely sanctioned in appropriate cases."). Plaintiff brazenly claimed that she and Dr. Campo had "collaborated" to prepare the forged documents. DE 63 at 190. And plaintiff's efforts to continue and cover up her artifice seemingly included documents created to falsely explain the inconsistencies in the forged documents she had created and submitted; even under questioning by the Court, she quixotically

7

clung to her story. *Id.* at 160-162. And yet she continued to vehemently deny, under oath, that she had forged or tampered with any documents in this case. *Id.* at 208.

Within two months of the hearing, on July 26, 2019, Judge Spatt issued his determinations based on those findings. *Esposito*, 390 F. Supp. 3d at 430. Judge Spatt granted the defendants' motion for sanctions as to the forged notes of Dr. Campo, finding, after a *de novo* review, that Judge Lindsay's findings were not only correct, but also confirmed the Court's view of the documentary evidence submitted with the motion papers. *Id*. Judge Spatt ruled that:

> [T]he Court finds that, without question, the forged notes occurred as a product of intentional bad faith; they were an attempt to prejudice the Defendants; and they were not corrected by the Plaintiff. The Plaintiff fabricated documents that were central to her disability discrimination claims. She carried out an act of deceit which raises fundamental questions regarding whether she deserves a determination on the merits. Her refusal to acknowledge her untruthfulness, notwithstanding the overwhelming evidence to the contrary, similarly casts doubt on her candor with the Court and her good-faith participation in the truth-finding process. Accompanying these deplorable acts, she gave deposition testimony that, intentional or not, undermines the Court's view of her capacity to be truthful.

*Id*. at 431. Judge Spatt noted that he had discretion to dismiss the case based upon these findings. *Id*. at 430. Ultimately, however, he determined that plaintiff's behavior was not "prolonged or ongoing" and declined to "categorize it as a pattern of misbehavior." *Id*. at 431. Therefore, rather than dismiss the claims outright, Judge Spatt imposed an array of lesser sanctions, including preclusion of the Campo documents, a negative inference instruction to the jury, a $5,000 monetary sanction and an award of attorney's fees and costs. *Id*.

*The Scope and Continued Effects of Plaintiff's Misconduct*

In awarding sanctions short of dismissal – which, of course, does represent an extreme penalty – Judge Spatt noted that "the forgery of the Campo notes is the only duplicitous behavior that the Defendants established by clear and convincing evidence[.]" *Id*. at 432. Particularly in light of the record now before the Court, a different conclusion is warranted. Plaintiff engaged in

8

dishonest, manipulative behavior that ranged far beyond the forgery of Dr. Campo's notes.  As discussed above, these efforts by plaintiff – many of which are incontestable – included: (1) submitting false and fraudulent documents to the EEOC well before the filing of this action;[2] (2) attesting to her counsel in 2016 the accuracy of the complaint herein, which is replete with references to fictitious events and the fraudulently created forgeries; (3) offering false testimony at her deposition in 2018;[3] (4) obtaining, or attempting to obtain, additional documents to support her perjurious testimony at or around the time of her deposition; and (5) offering unequivocally false testimony before the Magistrate Judge at an evidentiary hearing in 2019.[4]  Standing alone, these events clearly constitute an extended pattern of duplicitous behavior.

Equally important is the subsequent history of this matter.  At this writing, nearly 18 months have elapsed since this Court – through independent decisions by Judges Spatt and Lindsay – condemned plaintiff's "egregious" behavior, specifically noting that the misdeeds "occurred as a product of intentional bad faith" and decrying that they "were not corrected by the Plaintiff." *Esposito*, 390 F. Supp. 3d. at 431.  Notwithstanding this disconcerting history, litigation has continued unabated, while plaintiff has taken no steps to correct the record or otherwise compensate for her contumacious conduct.  No amendment has been made to the complaint, which is still laden with references to fictitious evidence.  A review of the massive record reveals nothing filed by plaintiff to correct the perjurious testimony offered either at her deposition or at the evidentiary hearing in this Court.  Countless days and significant costs have been expended by defense counsel and the Court in endeavoring to ferret out the falsehoods unreservedly fabricated

---

[2] DE 63 at 205-6.

[3] *See, e.g.*, DE 63 at 161-2 (plaintiff insisting that she did not create one of the forged documents).

[4] *See, e.g.*, DE 63 at 155-63, 193-200 (creating elaborate false explanations to account for inconsistencies in forged documents), 191 (falsely denying that she altered one document); 202 (claiming that forged documents were received in 2005), 208 (responding "absolutely not" to question of whether she tampered with or forged documents).
.

by the plaintiff, yet the record remains bereft of any effort by plaintiff to correct or otherwise remedy the numerous false, sworn statements made, the fabricated evidence created or the attendant harm inflicted by these acts.

Though born of fabrication, the consequences of plaintiff's deceit are all too real. The most easily quantifiable of those effects are the economic costs unjustly borne by defendants. At present, defendants have been able to document unnecessary fees and costs totaling over $80,000. *See, e.g.*, DE 101-1. While counsel can reasonably quarrel with some of the details of the application, it is beyond peradventure that plaintiff's mischief has caused damages of significant economic magnitude.

Yet the impact of plaintiff's misconduct goes beyond economic costs inflicted on defendants and the waste of judicial resources. Plaintiff opted to bring this suit not only against a public educational institution, but several individuals. Being the subject of a federal civil action charging invidious discrimination is no small thing, bearing emotional and personal costs that cannot be remedied by an award of litigation expense. *See Anaba v. Cty. of Suffolk*, 2014 WL 1411770, at *12 (E.D.N.Y. Apr. 11, 2014) ("[T]he disruption, inconvenience and scrutiny that accompany civil litigation can have serious impact on individual defendants, including in such matters as career advancement, applying for a new position or obtaining loans."). Imposing such consequences on the individual defendants poses particular concerns given that at least some allegations are rooted in firmly established falsehoods. *See, e.g.*, DE 1 ¶¶ 56-57 (falsely accusing defendant Gerli of denying requests made "[i]n accordance with [plaintiff's] physician's indications").

Indeed, plaintiff shows no indication of regret concerning her sanctionable conduct. Remarkably, her cross-motion to vacate the imposition of attorney's fees and the $5,000 sanction

suggests that whether Judge Spatt "was correct in awarding such sanctions will have to await the conclusion of proceedings in the District Court." DE 101-21 at 4. Furthermore, plaintiff argues that "the alleged forged note was immaterial to the merits of her disability claim." *Id.* That plaintiff makes this suggestion after findings by two judicial officers that the forged documents were central to plaintiff's claims, is at best inexplicable and at worst deliberately misleading. *See Esposito*, 390 F. Supp. 3d at 431 ("The Plaintiff fabricated documents that were central to her disability discrimination claims."); DE 69 at 4 (finding that one of the forged documents "was central to the claim of disability discrimination and the failure to accommodate").

Similarly, in opposing summary judgment, counsel for plaintiff argues:

> Esposito's accommodation requests were made through the submission of *doctors' notes*.

and

> There is *proof going back to 2005* that *Esposito's doctors* detailed the need for Esposito to have reasonable accommodations . . . .

DE 110-11 at 4, 23-24 (emphasis added). Read literally, these arguments – suggesting that there was evidence by multiple doctors in 2005 that plaintiff required accommodations – rest upon the fictitious documents created by plaintiff. Indeed, the argument expressly rests, at least in part, upon plaintiff's false deposition testimony regarding the forged notes. *See* DE 110-11 at 4 (citing to plaintiff's deposition at 126:13-22, in which she discusses the Campo notes). Even if poorly phrased by *pro bono* counsel – who seemed to have struggled to avoid references to plaintiff's perjurious testimony and fabricated evidence – these arguments demonstrate the inextricable impact of plaintiff's deceitful conduct on this proceeding.

Finally, as part of the summary judgment motion, with respect to the suspect records of Dr. DiCanio, plaintiff attempts to raise issues of material fact based on assertions that serve to resurrect

11

her improper conduct and further demonstrate the unreliability of those records. For example, plaintiff attempts to dispute testimony by the doctor that her handwriting appears on one of his medical records, claiming that such testimony constitutes an "inadmissible opinion" by Dr. DiCanio. DE 110-1 ¶ 103. Worse yet, confronted with a medical record from Dr. DiCanio listing necessary accommodations in her handwriting, plaintiff objects, contending, based on her own testimony, that "Plaintiff and Dr. DiCanio collaborated" on the note. *Id.* ¶ 104. This response is problematic for two reasons: First, patients and medical professionals do not normally act as joint scriveners in the creation of written medical reports. Second, this fantastic notion of "collaborating" to create a list of medically-prescribed accommodations mirrors her perjurious testimony before Magistrate Judge Lindsay to explain away her handwriting on one forged note from Dr. Campo. *Compare* DE 110-1 ¶ 104 *with* DE 63 at 190. This echo of her uncorrected false testimony emerging in response to summary judgment further undermines any hope that plaintiff has seen the error of her ways.

Enough is enough.

**DISCUSSION**

The motions currently pending include: (1) defendants' submission seeking to recover attorneys' fees and costs incurred as a result of plaintiff's misconduct, and documenting expenditures of approximately $80,000 (DE 101-9); (2) plaintiff's cross-motion to reconsider the award of this sanction and the separate $5,000 sanction imposed, predicated upon, *inter alia*, her alleged inability to pay (DE 101-21); and (3) defendants' motion for summary judgment (DE 109).[5] The submissions are weighty – assembled into a stack, the filings measure approximately

---

[5] Because, as set forth herein, plaintiff's conduct warrants dismissal of all claims, the Court does not reach the merits of the summary judgment motion. The Court has considered certain materials submitted with the summary judgment motion only for the purpose of evaluating the appropriate remedy for plaintiff's misconduct.

fifteen inches high.

*Reconsideration of the Sanctions Order*

On her motion, plaintiff moves for reconsideration of Judge Spatt's sanctions order, specifically vacatur of the $5,000 economic sanction, reduction of the fees and costs order to 10% of the amount sought (a reduction of approximately $72,000), and "other and further relief as may be deemed just, proper and equitable." DE 101-21 at 13. Plaintiff's application therefore invites reconsideration of the propriety of the entire sanctions award, as Judge Spatt's remedy was designed to address the harms caused by plaintiff in a comprehensive way. Even assuming, however, that plaintiff had not moved for reconsideration, the Court retains the discretion to reconsider Judge Spatt's order *sua sponte*. As one court observed:

> Under Federal Rule of Civil Procedure 54, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). "A district court ... possesses the inherent authority to *sua sponte* reconsider its own interlocutory orders before they become final." *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail Rigging, LLC*, 2015 WL 545565, at *2, 2015 U.S. Dist. LEXIS 15909, at *7 (S.D.N.Y. Feb. 9, 2015). "*Sua sponte* reconsideration is appropriate where there is a need to correct a clear error or prevent manifest injustice, there is an intervening change in the applicable law, or new evidence is available." *Id.* (quoting *Benavidez v. Piramides Mayas Inc.*, 2013 WL 2357527, at *3, 2013 U.S. Dist. LEXIS, at *7–8 (S.D.N.Y. May 24, 2013)). "Whether such revision is appropriate in any given case is within the sound discretion of the trial judge." *Acha v. Beame*, 570 F.2d 57, 63 (2d Cir. 1978).

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 381 F. Supp. 3d 185, 209 n.36 (N.D.N.Y. 2019). Particularly in light of subsequent events and the additional evidence before the Court, the undersigned finds that it is appropriate to exercise such discretion here.

For the reasons discussed, to the extent that plaintiff's motion to reconsider sanctions is predicated on an argument that the forgeries were immaterial or otherwise harmless, the motion is

13

rejected as spurious. The gravamen of plaintiff's motion, though, other than quarrelling with the amounts sought by counsel, rests on her inability to pay. The materials submitted suggest that plaintiff cannot pay the full amount of fees sought, lacking the ability to pay the costs already incurred (let alone additional sums that could be reasonably anticipated should this matter proceed). Therefore, the Court grants the motion to the extent that it seeks to vacate the award of attorneys' fees. At the same time, plaintiff's financial situation, while difficult, does not excuse her from the payment of the $5,000 sanction imposed by Judge Spatt, as it appears that she has the ability to make that payment. Therefore, the motion is granted in part, and denied in part.

Defendants raise the question of deterrence, citing case law suggesting that an inability to pay should not undermine an attorneys' fee award. But, as the Second Circuit has held, "fee awards are at bottom an equitable matter, [and] courts should not hesitate to take the relative wealth of the parties into account." *Shangold v. Walt Disney Co.*, 275 F. App'x 72, 74 (2d Cir. 2008) (quoting *Faraci v. Hickey–Freeman Co.*, 607 F.2d 1025, 1028 (2d Cir.1979)). While the Court retains the discretion to leave the award of attorney's fees standing despite plaintiff's seeming inability to pay, it declines to do so, as this would represent an exercise in futility.

At the same time, granting the vacatur of the attorney's fee award – as requested by plaintiff – compels reconsideration of the efficacy of the remedy crafted by Judge Spatt. The need for deterrence of such egregious conduct requires that some additional remedy be imposed. "It strikes us as elementary that a federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989); *Pope v. Fed. Exp. Corp.*, 974 F.2d 982, 984 (8th Cir. 1992) (finding dismissal of plaintiff's action appropriate where plaintiff introduced manufactured evidence and perjured testimony in an attempt to enhance the case). That concern,

14

together with the continuing impact of plaintiff's deceitful acts and the reexamination of that conduct given the fuller record here, requires dismissal of this case.

*Dismissal*

It bears repeating that Judge Spatt determined in July 2019 that, given the facts uncovered in the evidentiary hearing, the Court had the discretion at that time to dismiss plaintiff's claims. *Esposito*, 390 F. Supp. 3d at 430. In determining that he need not do so, Judge Spatt focused on the third element of the test outlined in *McMunn v. Mem'l Sloan–Kettering Cancer Ctr.*, 191 F. Supp. 2d 440 (S.D.N.Y. 2002), to wit:

> "(1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future."

*Esposito*, 390 F. Supp. 3d at 430–31 (quoting *McMunn*, 191 F. Supp. 2d at 446). Notably, the third element of the test – whether the misbehavior constitutes a pattern or an isolated instance – was the sole basis for the decision to refrain from dismissal: Judge Spatt otherwise expressly found that the actions here were the product of intentional bad faith that prejudiced the opposing parties and that the misconduct had not been corrected.[6] *Id.* at 431.

Based on the record before him, Judge Spatt found that plaintiff's behavior in this case was "not comparable to cases where courts dismissed claims due to fraud on the court." *Id.* at 431 (citing, *inter alia*, *Shangold v. Walt Disney Co.*, 275 F. App'x 72, 73 (2d Cir. 2008)). However, examination of the record now before the Court suggests that the pattern of misconduct here is remarkably similar to that in *Shangold*. The plaintiffs in that case, just like Ms. Esposito,

---

[6] While he made no findings as to the likelihood of future repetition, Judge Spatt determined that the sanctions imposed – particularly the economic sanctions – would "sufficiently deter future misbehavior." *Esposito*, 390 F. Supp. 3d at 432.

"submitted fraudulent evidence to the district court in order to bolster their claim," "offered testimony that the district court properly found to be false, at their respective depositions, in order to bolster their claims and continue the fraud," and made "repeated false statements [which] show[ed] their willfulness and bad faith," actions which "resulted in significant costs to the defendants." *Shangold*, 275 F. App'x at 73–74. Upon these facts – which are highly similar to those of the instant case – the Second Circuit affirmed Judge Pauley's dismissal of the action, noting:

> While dismissal is indeed a "harsh sanction," *In re Harris*, 464 F.3d 263, 272 (2d Cir.2006), a district court has the inherent power to sanction parties in order to "manage [the court's] affairs so as to achieve the orderly and expeditious disposition of cases," *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir.2000).

*Shangold*, 275 F. App'x at 73. Here, plaintiff's broad, unmitigated wrongdoing has rendered impossible any effort to effect an "orderly and expeditious disposition," and dismissal is required.

In reaching this conclusion, the Court is guided by another decision – raised by the parties – by Judge Pauley. In *Lawrence v. City of New York*, 2018 WL 3611963 (S.D.N.Y. July 27, 2018), defendants moved for dismissal as a sanction under Federal Rules of Civil Procedure 11, 26 and 37, predicated upon the production of photographs during discovery in the case. In that matter, a civil rights action based upon allegedly improper police conduct during a warrantless search, the plaintiff provided her attorney with a series of photographs purporting to represent the condition of her apartment just days after the search. *Id.* at *1. The attorney produced the photographs in discovery, and the plaintiff testified under oath that the photographs were taken by her son or a friend two days after the incident. *Id.* Later, she changed her account to suggest that she had taken most of the photos. *Id.* Examination of metadata revealed that the photographs were created a full two years after the search. *Id.* After further proceedings, plaintiff provided several additional

16

fabricated accounts attempting to compensate for her false testimony and fabricated evidence. *Id.* at *2, 6-7.

As Judge Pauley observed:

> The Federal Rules of Civil Procedure provide for sanctions based on litigation misconduct. Courts also "possess certain inherent powers, not conferred by rule or statute ... to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (citation and marks omitted). Courts have the inherent power to correct a fraud upon the court. Fraud upon the court exists where a litigant attempts to "improperly influence[ ] the trier" of fact, "lies to the court and h[er] adversary intentionally, repeatedly, and about issues that are central to the truth finding process," or "knowingly submit[s] fraudulent documents to the Court." *Passlogix, Inc. v. 2FA Tech., Inc.*, 708 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (citation and marks omitted). A district court has broad discretion in fashioning sanctions under its "inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002).
>
> . . . .
>
> "Our judicial system generally relies on litigants to tell the truth...." *McMunn*, 191 F. Supp. 2d at 445. Therefore, "[f]raud upon the court ... seriously affects the integrity of the normal process of adjudication." *Hargrove v. Riley*, 2007 WL 389003, at *11 (E.D.N.Y. Jan. 31, 2007) (citation and marks omitted). "[T]ampering with the administration of justice ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Shangold v. Walt Disney Co.*, 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).

*Lawrence*, 2018 WL 3611963, at *2, *6.

Judge Pauley made observations about the conduct in *Lawrence* that equally apply to the troubling record in this case:

> The creation of staged photos was the beginning of a sustained effort by Lawrence to mislead Defendants and this Court. . . . Lawrence's attempts to explain the photographs and her deposition testimony continue a pattern of evasion and untruths. . . . These shifting explanations are as troubling as the photographs themselves. This Court does not know how it can credit any of Lawrence's explanations . . . [and] her pattern of misbehavior appears likely to continue. *See DAG Jewish Directories, Inc. v. Y&R Media, LLC*, 2010 WL 3219292, at *5

17

> (S.D.N.Y. Aug. 12, 2010) (intentional fraud on court and subsequent lies to cover it up showed that "further misconduct [was] likely"); *McMunn*, 191 F. Supp. 2d at 462 (litigant's "lies and misconduct will almost certainly continue in the future if this action is permitted to go forward ... nullifying any chance for a fair adjudication of the merits").
>
> . . . .
>
> Finally, Lawrence's "misconduct did not concern a peripheral or an incidental matter[.] ... Rather, [it] goes to the heart of the case by making it apparent that defendants can rely only on fraudulent or defective records...." *Cerruti 1881*, 169 F.R.D. at 583. "[A]ll litigants, including *pro ses*, have an obligation to comply with court orders. When they flout that obligation, they, like all litigants, must suffer the consequences of their actions." *McDonald v. Head Crim. Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988).
>
> Lawrence's deceptive conduct and shifting excuses have completely undermined her credibility. This Court has no way of knowing what story Lawrence would offer if this case went to trial. *See Hargrove*, 2007 WL 389003, at *11 (severe sanctions were warranted based on plaintiff's intentional document forgeries, which were submitted in discovery and again as exhibits to his motion). Any sanction less than dismissal, "such as a jury instruction, would be ineffective." *See McMunn*, 191 F. Supp. 2d at 462. And "merely excluding the fabricated evidence would not only fail to address ... [P]laintiff's other misconduct ... but would also send the [P]laintiff, and future litigants like [her], the message that they have everything to gain, and nothing to lose, by continuing to submit fabricated evidence." *Slate v. Am. Broad. Cos., Inc.*, 941 F. Supp. 2d 27, 52 (D.D.C. 2013) (citation and marks omitted) ("Dismissal is particularly appropriate where a plaintiff seeks to enhance the merits of her case with fabricated evidence and fictionalized testimony.").

*Id.* at *6–7. The instant case is plagued with the very same concerns. Given this history, the Court has no confidence that plaintiff will not continue to engage in misconduct, cannot anticipate the testimony that plaintiff would offer before a jury, and finds that her unrelenting, outrageous conduct thoroughly undermines her credibility. Dismissal is required to remedy the false testimony and fabricated evidence manufactured by this plaintiff; any lesser sanction, on this record, would fail to meet the needs of specific and general deterrence required by plaintiff's conduct, or provide a just and efficient result in this case.

18

**CONCLUSION**

Based on the foregoing, it is hereby ORDERED as follows:

1. Plaintiff's motion to reconsider sanctions order is granted in part and denied in part, and the sanctions order is modified as follows:

    a. Judge Spatt's order directing payment of attorneys' fees and costs is vacated based on plaintiff's inability to pay;

    b. Plaintiff is directed to pay the economic sanction of $5,000 previously imposed; and

    c. As an additional sanction for the unmitigated misconduct, plaintiff's claims are DISMISSED in their entirety.

2. Defendants' application for imposition of attorneys' fees and costs totaling $80,235.20 is consequently denied;

3. Defendants' motion for summary judgment is deemed withdrawn in light of the determinations herein.

The Clerk of the Court is directed to enter judgment consistent with this Order and close the case.

**SO ORDERED.**

Dated: Central Islip, New York
February 6, 2021

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge